UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

|  |  |  |
|---|---|---|
| OHANA MILITARY COMMUNITIES, LLC, | ) | Case No.  CV18-00042KJM |
|  | ) |  |
| Plaintiff, | ) | August 6, 2018 |
|  | ) | 9:57 a.m. |
| vs. | ) |  |
|  | ) |  |
| CARA BARBER, | ) |  |
|  | ) | U.S. District Court |
| Defendant. | ) | 300 Ala Moana Boulevard |
|  | ) | Honolulu, HI 96850 |
| _____ | ) |  |

TRANSCRIPT OF HEARING ON MOTION TO DISMISS FOR FAILURE TO STATE A
CLAIM
BEFORE THE HONORABLE KENNETH J. MANSFIELD
UNITED STATES MAGISTRATE JUDGE

<u>APPEARANCES:</u>

For Plaintiffs:                    COX FRICKE LLP
                                   By:  RANDALL C. WHATTOFF, ESQ.
                                   Queens Court, Suite 600
                                   800 Bethel Street
                                   Honolulu, HI  96813

For Defendant:                     REVERE & ASSOCIATES, LLLC
                                   By:  TERRANCE M. REVERE, ESQ.
                                   970 North Kalaheo, Suite A-301
                                   Kailua, HI  96734

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

---

Maukele Transcribers LLC
Jessica B. Cahill, CER/CET-708
P.O. Box 1652
Wailuku, Maui, Hawaii 96793
Telephone: (808)244-0776

APPEARANCES: (Continued)

| For Defendant: | LYONS BRANDT COOK & HIRAMATSU |
| | By:  BRADFORD F.K. BLISS, ESQ. |
| | Davies Pacific Center, Suite 1800 |
| | 841 Bishop Street |
| | Honolulu, HI  96813 |
| For Counterclaimant Cara Barber: | LAW OFFICES OF IAN MATTOCH |
| | By:  PATRICK KYLE SMITH, ESQ. |
| | Pacific Guardian Center |
| | 737 Bishop Street, Suite 1835 |
| | Honolulu, HI  96813 |

```
 1  AUGUST 6, 2018                              9:57 A.M.

 2            THE CLERK:  All rise.  The United States District Court

 3  for the District of Hawaii with the Honorable Kenneth J.

 4  Mansfield, United States Magistrate Judge presiding is now in

 5  session.  Please be seated.

 6            Civil 18-42KJM, Ohana Military Communities, LLC, et al.

 7  v. Cara Barber.  This case has been called for a motion to

 8  dismiss for failure to state a claim.  Counsel, please make your

 9  appearances for the record.

10            MR. WHATTOFF:  Good morning, Your Honor.  Randy

11  Whattoff for Ohana Military Communities and Four City Residential

12  Management.

13            THE COURT:  Good morning.

14            MR. REVERE:  Good morning, Your Honor.  Terry Revere,

15  Brad Bliss, and Kyle Smith for Cara Barber.

16            THE COURT:  Okay.  Good morning to all of you.  You

17  folks can be seated.  I had a couple of preliminary thoughts and

18  then you guys can argue for as long as you would like.

19            One, you know, given the -- really what's the crux of

20  this case, is a confidential settlement agreement, and I want to

21  remind everyone this hearing isn't sealed.  I'm not going to seal

22  the minutes, I'm not going to seal the order.  It's a public

23  forum and a public hearing, so let's all just try to be mindful

24  of that.  I'll try not to trip over myself and suggest you folks

25  all do the same.
```

```
 1              Secondly, you know, on the substance of the motion,
 2    having not yet heard from anybody what I'm thinking at the moment
 3    is I am inclined to grant the motion except as to breach of
 4    contract.  I have reviewed the confidentiality clause that was
 5    submitted, at least an excerpt of it was submitted under seal,
 6    and I think there are questions that need to be hashed out on the
 7    merits on that particular claim.
 8              Certainly, there probably is more detail in the
 9    counterclaim, and you could have put in that, but I don't think
10    there's really any question what's being alleged, what the
11    contract is, what the provision is that's alleged to have been
12    breached.  There maybe are some questions as to exactly how that
13    alleged breach might have occurred, but in my mind that can be
14    handled through discovery.
15              Otherwise, I'm inclined to grant the motion.  So, those
16    are my thoughts, but please argue anything and everything you
17    would like.  And, I guess, Mr. Whattoff, it's your motion.
18              MR. WHATTOFF:  Thank you, Your Honor.  Well, let me
19    just briefly then respond on the breach of contract claim.
20              THE COURT:  Sure.
21              MR. WHATTOFF:  We do think that the failure to plead
22    the sufficient facts related to the contract is really relevant
23    here and there's two reasons.
24              THE COURT:  Uh-huh.
25              MR. WHATTOFF:  One is that -- first off, it's -- the
```

```
1  way that I read the counterclaim, it's not Ohana or Four City
2  that's alleged to have breached the contract, it's the Navy.  And
3  I'm not sure whether they're saying that a disclosure from Ohana
4  to the Navy is what was a breach of contract or whether a
5  disclosure by the Navy, pursuant to an employer request was the
6  breach.
7           So, those create very different arguments for us, and I
8  think they would impact how you would interpret the settlement
9  agreement, because the settlement agreement does permit
10 disclosure to LLC members, which would include the Navy.  So, I
11 think that those pleading elements really are important here.
12 And I think that they're also important because as it stands, I'm
13 not sure what's alleged to have been disclosed either.  Is it the
14 settlement amount?  Is it that the actual settlement agreement
15 was transmitted?  We certainly aren't aware of any transmittal
16 that's occurred to the Navy.
17           THE COURT:  Uh-huh.
18           MR. WHATTOFF:  I'm not aware of that ever happening.
19 So, it is important that we get that information so that we can
20 address it with our client and respond to it --
21           THE COURT:  Right.
22           MR. WHATTOFF:  -- because I think we will have a very
23 strong substantive response to the extent we can identify what it
24 is we're alleged to have done.
25           THE COURT:  So, would that mean if I agree with you
```

```
 1    there, then it would be a dismissal with leave to amend?

 2              MR. WHATTOFF:  Yes, Your Honor.  That's fine.

 3              THE COURT:  Right.

 4              MR. WHATTOFF:  I would accept that, Your Honor,

 5    because --

 6              THE COURT:  Right.

 7              MR. WHATTOFF:  -- like I said, I think that we might

 8    then have a follow-up motion --

 9              THE COURT:  Uh-huh.

10              MR. WHATTOFF:  -- based on what they state or maybe

11    not.

12              THE COURT:  Right.

13              MR. WHATTOFF:  I just don't know.  I truly think it's a

14    situation where we just don't have sufficient facts to respond to

15    it.

16              THE COURT:  Sure.  And just reading that clause, one, I

17    was genuinely surprised by it.  That an LLC with the Navy as one

18    of its members agreed to confidentiality, but that's probably a

19    question for another day, but, two, it's not a blanket exception,

20    right.  There's qualifying language as to when such information

21    could be transmitted to the Navy.

22              So, that's why I thought discovery might need to occur

23    and that's more of an MSJ or trial issue, but --

24              MR. WHATTOFF:  Yeah, like I said, Your Honor, I don't

25    know that there's a lot of additional facts --
```

```
 1              THE COURT:  Yeah.

 2              MR. WHATTOFF:  -- but if we could clear up whether it's

 3   a transmittal from Ohana or Four City to the Navy, or whether

 4   it's a disclosure by the Navy to -- pursuant to an employer

 5   request, and then what is, exactly, the disclosure.  Whether it's

 6   the settlement agreement, the amount.  Because like I said, it is

 7   sort of -- I don't want to say nuance, but it's a detailed

 8   confidentiality provision.  In order to address whether there was

 9   a breach, I do think we need those at least two other elements.

10              THE COURT:  Okay.

11              MR. WHATTOFF:  Your Honor, on your other points perhaps

12   I would like to -- given your inclination, perhaps it might make

13   more sense for counterclaimant to give their argument --

14              THE COURT:  Okay.

15              MR. WHATTOFF:  -- and then I can respond to the extent

16   it's relevant.

17              THE COURT:  Okay.  That's fair.

18              MR. WHATTOFF:  I could give you my argument, but I

19   think that might be more efficient.

20              THE COURT:  Yeah, why don't you wait, and then you can

21   rebut.

22              MR. WHATTOFF:  Thanks.

23              THE COURT:  Go ahead, sir.

24              MR. REVERE:  Your Honor, thank you.  First of all, and

25   I appreciate Your Honor's caution to us, however, what Mr.
```

```
1   Whattoff just said in this open proceeding by mentioning the word
2   amount is exactly what he said there was this horrible breach by
3   Ms. Barber by saying there was some amount paid.  That was their
4   allegation.  They're doing it again here.
5        So, in any event, with regard to breach of contract I
6   appreciate Your Honor's understanding, but Mr. Whattoff knows
7   exactly what we're talking about.  In the settlement agreement --
8   and I don't think this is revealing anything untoward or crazy,
9   and it's a matter of public knowledge anyway, the Navy is half
10  owner of Ohana.  In the settlement agreement, the Navy is defined
11  as being Ohana.
12       So, when the Navy goes out and hands out documents that
13  contain chapter and verse, and I don't want to get into the
14  details --
15            THE COURT:  Uh-huh.
16            MR. REVERE:  -- for the very reason Your Honor said,
17  which is why we're not attaching hundreds of documents to this
18  complaint, because they try to put us in this Catch-22 position
19  if we show how they breach, they say, oh, that's another breach
20  by showing how we breached.  So --
21            THE COURT:  Can I ask you just one question?
22            MR. REVERE:  Sure.
23            THE COURT:  It was either in the counterclaim itself or
24  in the motion papers there's a suggestion that there was a
25  disclosure made to Reuter's News Service.
```

1            MR. REVERE:  Yes.

2            THE COURT:  Is it out there?  If you Googled it, is it

3    out there?

4            MR. REVERE:  I don't know --

5            THE COURT:  Okay.

6            MR. REVERE:  -- if Reuter's published a story and what

7    they did with it.

8            THE COURT:  Okay.

9            MR. REVERE:  Also, there is a misrepresentation that we

10   said they were compelled to do it.  No, we didn't say they're

11   compelled to do it.  We're saying, they voluntarily just did it.

12           So, the -- so, one, the Navy and Ohana are one in the

13   same in the settlement agreement.  That's very, very clear.  They

14   handed it out to a news agency.  So, that's that with regard to

15   the breach of contract, Your Honor.

16           I want to talk about, obviously, given Your Honor's

17   inclination --

18           THE COURT:  Yeah, go ahead.

19           MR. REVERE:  -- may I ask before I start, so I don't

20   waste a lot of breath on something unnecessarily, but when Your

21   Honor said you were inclined to grant the motion was -- it's

22   without -- with leave to amend or without leave to amend, or does

23   it depend, I guess?

24           THE COURT:  You know, frankly, I'm not sure you can

25   amend to save the remaining claims.  So, that's where I'm headed

```
 1  right now --

 2          MR. REVERE:  Okay.

 3          THE COURT:  -- is without leave to amend.  So, you

 4  can --

 5          MR. REVERE:  Okay.

 6          THE COURT:  -- talk me out of that.

 7          MR. REVERE:  All right.  I'll do my best.  Your Honor,

 8  with regard to the abuse of process claim, one of the cases, I

 9  think, that's very relevant to the abuse of process claim, as

10  well as the intentional infliction of emotional distress claim,

11  is the Young v. Allstate case, which is very, very critical.

12          In that case, Mr. Whattoff is correct, they do state

13  just making low ball settlement offers is something that insurers

14  do.

15          THE COURT:  Uh-huh.

16          MR. REVERE:  That does not constitute "abuse of

17  process," because that's something that's allowed in the

18  normal --

19          THE COURT:  Sure.

20          MR. REVERE:  -- it happens in litigation --

21          THE COURT:  Uh-huh.

22          MR. REVERE:  -- and that's clearly within the process.

23  The problem is what happened here is expressly, explicitly not

24  allowed to happen.  There's a reason why we have ethical rules

25  that say you don't go to plaintiffs or their attorneys and say,
```

 1 | gee, I'll settle this case with you against General Motors as

 2 | long as you, plaintiff's attorney, never sue General Motors

 3 | again.  There's an explicit rule and, therefore, this is not just

 4 | the normal rough and tumble of litigation.  This is something

 5 | specifically outside of the litigation and that's why that is not

 6 | at all proper.

 7 | It is also not at all proper or normal to the process

 8 | to say this process -- this lawsuit against you, Ms. Barber, is

 9 | going to keep on going on as long as these attorneys are

10 | representing third parties.  That doesn't happen.  It's like you

11 | think her claims are frivolous, you beat her, you move for costs,

12 | you do whatever you feel like you need to do.  You don't say, I'm

13 | using this process as a vehicle to get rid of counsel in other

14 | claims.  That is not remotely normal to the process, and we think

15 | that's where Young is very, very distinguishable --

16 | THE COURT:  Okay.

17 | MR. REVERE:  -- from this case.  And since we're

18 | talking about Young, if I could jump on to the IIED claim.  Mr.

19 | Whattoff doesn't talk about Young in the context of IIED.  And in

20 | the Young case, Justice Levinson specifically found while this

21 | might not -- the series of low ball offers don't constitute an

22 | abuse of process there is a question of fact as to whether this

23 | constitutes intentional infliction of emotional distress, and

24 | that was allowed to go before the jury or the fact finder.

25 | Here, we've got something that's far worse than just

```
 1    doing low ball offers.  They're trying to put Ms. Barber in an
 2    impossible position, explicitly, and in violation of rules that
 3    govern litigation.  So, it's clearly outside of the bounds of
 4    that.  It's clearly intentional, and it would clearly, of course,
 5    normally inflict emotional distress when you're put in this
 6    Catch-22 position that they tried to put her in.
 7               With regard to the malicious prosecution claim, Your
 8    Honor, first of all our complaint was written before the Ninth
 9    Circuit came down and Your Honor, through hearings in this case,
10    is very familiar with the other case.
11               THE COURT:  Uh-huh.
12               MR. REVERE:  And then Ninth Circuit decision comes
13    down, but the Ninth Circuit decision that came down has nothing
14    to do with what we already prevailed upon, which will not change,
15    which was they sued her for breach of contract saying that we
16    breached the confidentiality.
17               THE COURT:  Uh-huh.
18               MR. REVERE:  They lost.  That isn't going to change,
19    it's not the subject of change, no one is changing it, there's no
20    writ of cert to the United States Supreme Court.  So, their
21    belief that we don't have a final decision on that is simply not
22    correct.
23               Yeah, in -- they talked about the Young case, which,
24    again, Your Honor, I would just comment that when looking at both
25    of these claims --
```

```
 1            THE COURT:  Uh-huh.

 2            MR. REVERE:  -- with regard to a Chapter 842 case,

 3    again, there's a big difference between this and just every other

 4    lawsuit.  We know that people are not happy with each other when

 5    they're suing, and they do things that annoy each other, et

 6    cetera, et cetera, but what they don't do is say, we're going to

 7    make you a hostage to other litigation and also know if the

 8    litigation goes on, we're going to pursue it.  As soon as that

 9    stops, and these attorneys stop representing other litigants,

10    you're free to go.  That is far, far beyond what is basically

11    text book extortion.  They're trying to deprive her of her rights

12    to talk about these issues, which are very, very important to

13    her, and they are extorting her, clearly, to prevent other

14    litigation from going forward that is not at all kosher under our

15    process.

16            THE COURT:  If I agree with you --

17            MR. REVERE:  Right.

18            THE COURT:  -- does it work both ways?  I mean you're

19    both attacking each other in multiple forums, holding all of this

20    over each other's heads.  So, why isn't it a two way street --

21            MR. REVERE:  The --

22            THE COURT:  -- because of the alleged ethical

23    violations?

24            MR. REVERE:  Well, I think that's certainly one of

25    them.  The reason why it's not a two way street is Ms. Barber is
```

```
 1    not saying, hey, we'll drop our counterclaim, but we don't want

 2    Randy Whattoff to represent you on the Lake case and all this

 3    other --

 4              THE COURT:  Uh-huh.

 5              MR. REVERE:  -- litigation.  That's what's different

 6    about this case.  It's using her to shut people up in other

 7    cases, get rid of counsel in other cases, prevent information.

 8    That's what makes it different.  Yeah, people -- I get it.  I'm

 9    accused of being a pain in litigation, my opponents are often a

10    pain, but I don't say, hey, Randy, you can't defend this person

11    anymore, et cetera, et cetera, and there's a specific rule on

12    that.

13              THE COURT:  Okay.

14              MR. REVERE:  With regards to the SLAPP statute, I

15    understand what counsel is saying that it's really more of a

16    procedural mechanism, but we do believe that you can assert this

17    as an independent claim to basically get your fees back for the

18    SLAPP.  So, we had conceded the vexatious litigant claim, Your

19    Honor, since, to me, inexplicably it only applies to natural

20    persons.

21              With regard to the civil rights claim, again, the Navy

22    is a state actor, number one.  The Navy, under that settlement

23    agreement, is defined as being Ohana.  So, we clearly have state

24    action without a doubt.  Secondly --

25              THE COURT:  So, is the Navy a party, because I don't
```

1   know that I have the full document in front of me?  So, I don't

2   know who is defined as a party, who is defined as an LLC member,

3   and who is a signatory.

4           MR. REVERE:  Okay.  Your Honor, we did not name the

5   Navy as a party; however, in paragraph 19, we say the United

6   States Navy is one of the owners of counterclaim defendant Ohana

7   and --

8           THE COURT:  Uh-huh.

9           MR. REVERE:  -- FCRM is the other owner.

10          THE COURT:  Okay.

11          MR. REVERE:  And, also, you don't need to have a state

12  actor under several provisions.  And, Your Honor, there is a Law

13  Review article from the Cardozo Law Review, which I will pull up

14  in a second that basically says when you have these entities --

15  for example, Hawaii was decided to have all these private

16  prisons.  That doesn't mean the private prisons get to --

17          THE COURT:  Uh-huh.

18          MR. REVERE:  -- well, we're just going to beat the

19  prisoners, turn them into slaves, do whatever we want to, to

20  them.  They're doing a state function.  Here, we're talking about

21  military housing, which was undisputedly used to be a completely

22  public function.  They have now entered into a public/private

23  partnership to do the same thing.  So, there is a -- number one,

24  there is not a requirement that you need to be a public entity in

25  order to be sued.  Section 1983 applies to any person.

```
 1              And, Your Honor, I apologize, I'm trying to scroll
 2    through here and find that Law Review Article.
 3              THE COURT:  If it's in the brief, I'll find it.  If it
 4    wasn't, it's too late to bring it up.
 5              MR. REVERE:  Okay.
 6              THE COURT:  Just leave it at that.
 7              MR. REVERE:  All right.  Then it's too late to bring it
 8    up.  Then, Your Honor, the -- so, that's with regard to the §1983
 9    claim.  It simply applies to any person, not just public actors.
10    And, in any event, they are public actors.
11              With regard to the wrongful settlement, again, the --
12    Mr. Whattoff's client knows exactly what we're talking about and
13    there is that claim under the Kawamata Farms case.  In order to
14    get into the micro details --
15              THE COURT:  Uh-huh.
16              MR. REVERE:  -- which I don't believe we need to do --
17              THE COURT:  We don't.
18              MR. REVERE:  -- we have to attach tons of stuff that is
19    problematic due to the history of this case.  And, Your Honor, if
20    I could just have one moment to confer with my co-counsel about
21    something.
22         (Counsel confer)
23              MR. REVERE:  Yeah, Your Honor, again, this is my first
24    question if -- we do believe that if anything is dismissed --
25              THE COURT:  Uh-huh.
```

 1              MR. REVERE:  -- it should be without prejudice.  If we

 2     need to provide more detail, you know, we will.

 3              THE COURT:  Okay.

 4              MR. REVERE:  Thank you.

 5              THE COURT:  Thank you.

 6              MR. WHATTOFF:  Your Honor, I hear Mr. Revere use words

 7     like extortion and hostage.  There's nothing like that that's

 8     pled in the counterclaim, and that's because nothing like that

 9     ever happened.

10              In 2016, I made a settlement proposal to Mr. Smith and

11     Mr. Revere where I said, you know, as part -- one of the terms

12     was that you folks would withdraw from representing the

13     plaintiffs in Lake and other subsequent cases.  And the reason

14     that we made that proposal is because we believe, and we still

15     believe, that there was misconduct in recruiting those

16     plaintiffs.  So, we thought how do you undo that sort of harm

17     where there's been misconduct in recruiting plaintiffs, well, you

18     get -- you don't get to recruit those plaintiffs.

19              THE COURT:  Uh-huh.

20              MR. WHATTOFF:  Kyle -- Mr. Smith points out to me that

21     that is an agreement -- a settlement agreement that you can't do,

22     that is prohibited under the Hawaii Rules of Professional

23     Conduct, and we say, oh, we didn't know that.  We'll take it off

24     the table.  That settlement offer is withdrawn.  That's it.

25     That's the extent of what we're talking about.  I think the

```
 1   settlement offer was out there for a day or two.  I have to go
 2   back to my emails to look at it.
 3           Now, Mr. Smith and Mr. Revere have tried to turn that
 4   event into the sinking of the Titanic.  And it's really a non-
 5   event.  They tried to bring it up at the preliminary injunction
 6   proceeding.  Judge Gillmor firmly dismissed it.  She said this is
 7   the kind of thing that happens in settlement.  You make a
 8   proposal, you take a look at that proposal.  Maybe you can't do
 9   that proposal, maybe it's got some problems, then you look and
10   see if there's other proposals that might work.  It's just part
11   of the process of settlement.  She dismissed it.
12           That wasn't enough.  Ms. Barber then went and filed
13   complaints with the Office of Disciplinary Counsel against me and
14   against Mrs. Munger for -- against Lisa Munger for doing this.
15   Now, they're trying to turn this into causes of action, but
16   there's nothing pled in here that would allow that non-event that
17   occurred in 2016, to turn into any of these causes of action
18   here.  It's certainly not pled, there's no way that there could
19   be any damages from that event, given that it ended moments after
20   it was made.  So, that's really not something that can support a
21   cause of action.
22           With regard to the specific arguments that were made by
23   Mr. Revere on the abuse of process claim, I do think that Young
24   is an important case to look at.
25           THE COURT:  Uh-huh.
```

 1           MR. WHATTOFF:  I think <u>Young</u> explicitly states that --

 2    not just that continued low ball offers are the only sort of

 3    settlement that won't support an abuse of process claim, but that

 4    the settlement process, in general, won't support an abuse of

 5    process claim.  It explicitly states that, and it states that

 6    because we want to encourage parties to come to settlement

 7    agreements.  We weren't trying to do anything improper by making

 8    the settlement proposal.  We were trying to make a proposal that

 9    undid the specific harm here, and we were trying to get to a

10    resolution of this.  And the courts want to encourage that and

11    not allow abuse of process claims when that sort of thing occurs.

12           On the IIED claim, there's not even been a pleading

13    here that this issue was conveyed to Mrs. Barber.  This was a

14    settlement proposal that was made to Mr. Smith and Mr. Revere.

15    They rejected it a few days later.  We withdrew it a few days

16    later.  So, there's been certainly no pleading that would rise to

17    the level that you need for an IIED claim, which is a very high

18    standard.

19           Finally, on the civil rights -- and I'm not even sure

20    what we're talking about on the civil rights claim.  It's three

21    paragraphs long.  The first paragraph is an incorporation by

22    reference.  The second paragraph references freedom of speech,

23    the Constitutions, wrongfully pursuing claims under the Color of

24    Law.  I don't know what civil rights we violated.

25           THE COURT:  Uh-huh.

 1            MR. WHATTOFF:  I don't know what laws we've allegedly

 2    violated.  I mean there's nothing here that could be a cause of

 3    action.  And we have nothing further, Your Honor.

 4            THE COURT:  Okay.  Thank you.

 5            MR. REVERE:  Your Honor, may I respond to those last

 6    comments?

 7            THE COURT:  Sure, go ahead.

 8            MR. REVERE:  Thank you, Your Honor.  With regard to

 9    what Mr. Whattoff just said, that's the problem here.  We're in a

10    -- I know it's a public courtroom, but a nearly empty courtroom

11    and a lawyer saying to a judge, oh, come on, judge, you know,

12    this is what I mean.  You know, this is what we are doing, why we

13    are doing it.

14            The problem is every fact in there is true for the

15    purposes of this motion without a doubt.  So, when Mr. Whattoff

16    comes in here, not under oath, and says, well, this is what we

17    meant, this is what we're really doing --

18            THE COURT:  Uh-huh.

19            MR. REVERE:  -- it's completely improper.  All of these

20    facts have to be deemed true.  All of the inferences have to be

21    construed in the light most favorable to us, and we have a jury

22    in this case to see what's true and what's not true.  So, just

23    saying this is what we are really thinking and doing, Judge, I

24    don't believe it, and I know it's not true, because we've got it

25    in black and white, and this is not part of the normal settlement

1 process, which is why they did it.

2       And there was a case, I can't remember which one it

3 was, where the younger Justice Levinson talked about, oh, well,

4 it's all just part of the settlement process, then Don Vito

5 Corleone can say sign it or I'll bash your skull in.  Oh, well,

6 it's just part of the settlement process.  So that's just false,

7 number one.

8       Number two, he says, oh, Judge Gillmor dismissed this.

9 Show me a motion, show me an order, because there isn't one.

10 It's not true.  And, again, we are entitled to a jury.  And, Your

11 Honor, in that Young case where they said you can get an

12 intentional infliction of emotional distress even in this

13 repeated low balling by an opponent, it says:  "That a plaintiff

14 may assert a claim for IIED for suffering from the Defendant's

15 conduct during a prior lawsuit.  A party is not liable for merely

16 insisting upon his legal rights in a permissible way," and then

17 they recite the Restatement 46, Comment G, "but it may be liable

18 for its conduct in the prior litigation that is not justifiable."

19       We have a specific rule that says don't do this, and

20 they do it, and then they say, oh, it was withdrawn and went

21 away.  That's what's driving what they're doing to this day.  We

22 don't want Smith, and to a lesser extent -- much lesser extent,

23 Revere representing these other parties.  Barber, you're not

24 going to go anywhere until we achieve that result.  That's what's

25 happening to this day.

1           So, to say, oh, it just all kind of went away, no it

2    didn't.  That's what's happening right now.  And that's why we

3    certainly would be entitled to that.

4           With regard to the IIED or the, excuse me, the civil

5    rights claim, we made it very clear.  It's her free speech right

6    in that something that is -- I'll put it this way.  That is not

7    in that settlement agreement is that she must give up her free

8    speech rights.  It is preserved, as a matter of the United States

9    and Hawaii Constitutions, and nothing in that settlement prevents

10   her from doing that.  They're mad about that, so immediately

11   after that settlement agreement, they invented this phony

12   solicitation campaign and said that she breached the settlement

13   agreement, both of which, for the purposes of this counterclaim,

14   must be deemed true, and they're trying to do it anyway.  That's

15   clearly a violation of her free speech rights, which are clearly

16   protected under 1983, Your Honor.

17           THE COURT:  Okay.

18           MR. REVERE:  Thank you.

19           THE COURT:  Thank you.  It's your motion, I'll let you

20   have the last word, if you would like.

21           MR. WHATTOFF:  Mr. Revere is right, I have added some

22   color here.

23           THE COURT:  Uh-huh.

24           MR. WHATTOFF:  I've added some color to show what's not

25   in the complaint and what they can't plead in the complaint.  An

1   IIED claim requires conduct that's regarded as atrocious and

2   utterly intolerable in a civilized community.  That determination

3   of outrageousness under Ross is for the Court to decide --

4            THE COURT:  Uh-huh.

5            MR. REVERE:  -- in the first instance.  That has not

6   been pled here.  All that has been pled is that a term was

7   proposed.  And, like I said, Mr. Revere is right that I've added

8   some facts here --

9            THE COURT:  Uh-huh.

10            MR. WHATTOFF:  -- but if you just look at the complaint

11   and what's in the complaint, it does not meet the standard of

12   outrageousness, Your Honor.

13            THE COURT:  Okay.  All right.  Thank you both.  We'll

14   take this under submission and issue an order.

15            MR. REVERE:  All right.  Thank you, Your Honor.

16            MR. WHATTOFF:  Thank you.

17            THE CLERK:  All rise.  Court stands in recess.

18         (Proceedings concluded at 10:22 a.m.)

19

20

21

22

23

24

25

CERTIFICATE

I, Jessica B. Cahill, court approved transcriber, do hereby certify that pursuant to 28 U.S.C. §753, the foregoing is a complete, true, and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated: November 13, 2018

Jessica B. Cahill, CER/CET-708